UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MEECHEE MORRIS,

    Plaintiff,

v.

FREDEANE ARTIS, B. SMITH,
and, P. DAVIS,

    Defendants.
_____/

Case No. 1:22-cv-325

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

Plaintiff Meechee Morris ("Morris") is a prisoner in the custody of the Michigan Department of Corrections ("MDOC"). Morris filed this prisoner civil rights lawsuit pursuant to 42 U.S.C. § 1983. The alleged incidents occurred at Earnest C. Brooks Correctional Facility ("LRF"). Jones sued LRF Warden Fredeane Artis, LRF Deputy Warden B. Smith, and LRF Assistant Deputy Warden P. Davis. This matter is now before the Court on defendants' motion for summary judgment (ECF No. 21) and Morris' motion for leave to amend his complaint (ECF No. 30).

    **I.**    **Morris' complaint**

Morris set out the following allegations in his verified complaint. On February 7, 2022, Morris and his entire housing unit were tested for COVID-19. Compl. (ECF No. 1, PageID.4). At his deposition, Morris testified that on that date, he was housed in the Baldwin housing unit. Morris Dep. (ECF No. 22-2, PgeID.192). Morris tested negative, but two prisoners, Burklow and Hunt, tested positive. Compl. at PageID.4. These two prisoners were not

1

immediately quarantined "but rather allowed to intermix and intermingle with plaintiff and other confirmed negative prisoners from 9:30am [sic] to 2:15pm [sic]." *Id*. Morris was concerned, inquired at the officers' station and "was informed that defendants had instructed ofc's to not quarantine the confirmed positive prioners [sic] because it was only two of them and it wasn't a big deal." *Id*.

On February 14, 2022, Morris and his entire housing unit was again tested for COVID-19. *Id*. at PageID.5. Morris alleged that, "Plaintiff tested positive based on defendants [sic] failure to quarantine confirmed positive prisoners on February 7, 2022." *Id*.

> On this same day in question February 14, 2022, Plaintiff spoke to defendant Artis who was in his housing unit and inquired about the orders not to quarantine confirmed positive prisoners on February 7, 2022. Defendant Artis verifed [sic] that she ordered the actions of ofc's on February 7, 2022.

*Id*.[1] Morris further alleged that, "Defendants know the risk from expsing [sic] anyone to Covid-19 as it has been discussed nationally and worldwide for almost two years." *Id*. at PageID.6.

Morris alleged one count, "Claim I" for "Deliberate Indifference / Failure to Protect" stating that,

> By virtue of the foregoing, defendants Artis, Smith and Davis [sic] failure to enforce or follow established Covid-19 protocol's [sic] and quarantine confirmed positive prisoners resulted in plaintiff being infected with Covid-19 in violation of the Cruel and Unusual Punishment clause of the Eighth Amendment of the United States Constitution.

*Id*. at PageID.6. Morris seeks compensatory and punitive damages. *Id*.

---

[1] Morris' complaint does not refer to the context of his alleged conversation with Warden Artis. As discussed, *infra*, Morris testified that he did not recall having a conversation with Warden Artis. On February 14, 2020, Morris was involved in a critical incident at the Baldwin Unit. At 11:30 a.m., 57 Baldwin Unit prisoners tested positive for COVID-19. At 12:00 p.m. Baldwin prisoners refused to comply with Captain Scriven's orders to return to their cells, a "Riot/Strike/Demonstration" ensued, and a staff member was assaulted. Eventually, non-party Deputy Warden King assigned the second shift officers into four squads to restore order. *See* Critical Incident Report (ECF No. 22-9).

**II.      Defendants' motion for summary judgment and Morris' motion to amend the complaint**

**A.      Legal standard**

Defendants have moved for summary judgment. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted).

"In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Here, Morris filed a verified complaint, which has the

3

same force and effect as an affidavit for purposes of responding to a motion for summary judgment. *See Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993).

### B. Morris' response, sur-reply, and motion to amend the complaint

#### 1. Background

Defendants filed their motion for summary judgment on March 3, 2023. Before responding to the motion, Morris sent a letter to the Clerk's Office asking for copies of his case file, stating "I have to write this letter, because of a cell search all my paper's [sic] was taken everything. So can I please have copies of everything dealing with my case at no charge to me cause I did nothing wrong to get this treatment." Letter (undated) (postmarked March 13, 2023) (ECF No. 23). Morris wrote another undated letter to the Clerk in which he stated that "I am without any of my case pleadings where the legal writer was transferred" and asked for copies of his complaint, and defendants' motion and brief for summary judgment so he could respond to the motion for summary judgment. Letter (undated) (postmarked March 22, 2023) (ECF No. 24). At the bottom of this request, Morris changed his story. Now, he had defendants' motion and brief in his possession, but he wants to object to the motion for summary judgment "because when I got that motion it was just pages all over the place not in any kind of order and after I had to set down and organize it all. [T]here were to [sic] many page's [sic] missing to figger [sic] this out." *Id*. Morris blamed either defendants' counsel who "did this to throw me off" or the prison mail room. *Id*. The Clerk's Office advised Morris of the cost of the copies. *See* Clerk's Letter (March 27, 2023) (ECF No. 24-1).

About two weeks later, Morris paid the Clerk for a copy of the complaint. *See* docket entry (April 10, 2023). On the same date, Morris filed a response to defendants' motion for summary judgment entitled, "Plaintiff's Objection to defendants' motion for summary

4

judgment and brief in support of motion" (ECF No. 25).  In this verified "objection/response", Morris stated that "Plaintiff received this Motion for Summary Judgment; and, brief in Support, not stapled, completely mixed up, several pages missing, the Brief ends at page 3, the Exhibits is missing pages," that "it is impossible to defend by way of responsive pleadings and affidavits," and that defendants' counsel engaged in a "tactic . . . done in an effort to hinder this process and cause Plaintiff harm." *See* Objection/Response at PageID.311-312.  As part of his objection, Morris asked the Court to strike defendants' motion or order defendants to re-serve the motion. *Id*.  Morris did not file his objection/response as a motion (*i.e.*, he did not designate it as a motion, did not file a supporting brief, and did not seek concurrence with defendants' counsel) and the Court did not docket it as a motion.

In their reply brief, defendants pointed out that this objection/response is not a motion, that Morris did not file a supporting brief as required by W.D. Mich. LCivR 7.1(a), and that Morris did not seek to obtain concurrence with them for a motion as required by W.D. Mich. LCivR 7.1(d).  Morris responded with an unauthorized sur-reply (ECF No. 27), contesting defendants' proof of service of the motion and brief, stating that he is not required to pay for copies of the motion and brief, suggesting that he can file an amended complaint, and asking the Court to strike defendants' motion or order defendants to re-serve the motion and brief.  A few weeks later, Morris filed a motion to amend the complaint (ECF No. 30).

### 2. Morris' objection/response

Morris has presented no basis for the Court to strike defendants' motion or order defendants to re-serve the motion and brief.  As discussed, Morris gave three different accounts to the Clerk's Office as to why he needed a copy of defendants' motion and brief: (1) all of his papers were taken during a cell search; (2) his legal writer was transferred and apparently took

5

Morris' legal papers with him; and, (3) Morris actually had motion and brief, but it was unorganized with missing pages either because defendants' counsel "did this to throw [him] off" or the prison mail room did something to the motion and brief. While Morris paid the Clerk's Office for a copy of his complaint, he chose not to pay for a copy of defendants' motion or brief. Next, Morris did not file his objection/response as a motion seeking relief from the Court and it was not docketed as such. Furthermore, there is no record that Morris took an informal approach to contact defendants' counsel directly to obtain the alleged missing documents. That being said, while Morris did not file a substantive response, the Court is required to treat his verified complaint (ECF No. 1) as an affidavit in response to the motion for summary judgment. *See Lavado*, 992 F.2d at 605.

### 3.    Morris' motion to file an amended complaint

Morris' proposed amended complaint (ECF No. 30-1) contains few factual allegations and appears to address some of the deficiencies pointed out in defendants' motion for summary judgment. For example, Morris no longer claims that he spoke to Warden Artis about the quarantine situation; rather, Morris now claims that Warden Artis "did not have any plan of action in dealing with Covid-19 positive prisoners." Proposed Amend. Compl. at PageID.341. Morris' original complaint did not include any specific allegations against Deputy Warden Smith; Morris now claims that on an unidentified date Smith "did not ensure that Plaintiff had access to cleaning supplies, safety clothing, a proper face mask, and other essential items to minimize the risk of exposure to Covid-19." *Id*. Similarly, Morris' original complaint did not include any specific allegations against Assistant Deputy Warden Davis; Morris now claims that Davis "allowed [prisoners] Burklow and Hunt, to remain in LRF Unit-B, while positive with Covid-19

6

to infect negative prisoners in an effort to allow the virus to go through the prison and be done with." *Id*.  Defendants oppose the motion as untimely, prejudicial and futile.

The case management order (CMO) (Oct. 4, 2022) (ECF No. 13) provided a 45-day window for Morris to amend the complaint.  CMO at PageID.45.  That window closed on November 18, 2022.  In addressing Morris' motion, the Court looks to Fed. R. Civ. P. 15(a)(2), which provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave" and that "[t]he court should freely give leave when justice so requires."  Because Morris also seeks to extend a deadline in the CMO, he must demonstrate "good cause" to modify that deadline.  *See* Fed. R. Civ. P. 16(b)(4) ("[a] schedule may be modified only for good cause and with the judge's consent").

Here, Morris did not follow the procedure for motion practice in filing his motion to amend, *i.e.*, he did not include a supporting brief as required by W.D. Mich. LCivR 7.1(a) and he did not seek concurrence as required by W.D. Mich. LCivR 7.1(d). Morris' motion to amend does not address either good cause or explain why justice requires that he be allowed to amend the complaint at this late date.  Morris filed his verified complaint (ECF No. 1) on April 4, 2022.  Since that time, defendants have relied on the allegations in that complaint in defending the case, in deposing Morris, and in filing their motion for summary judgment.  Defendants will be prejudiced by having Morris change the allegations in his lawsuit now that discovery is closed and a dispositive motion has been filed.  For these reasons, Morris' motion to amend (ECF No. 30) should be denied.

### C. Discussion

### 1. Morris' Eighth Amendment claim

Morris seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

As discussed, Morris' Eighth Amendment claim is based upon incidents at the Baldwin Unit on February 7, 2022 and February 14, 2022. This Court addressed a nearly identical claim involving the Baldwin Unit incidents in *Shepard v. Artis*, No. 1:22-cv-326, 2023 WL 6394064 (Aug. 29, 2023), *R&R adopted*, 2023 WL 6389746 (W.D. Mich. Oct. 2, 2023).[2] In *Shepard*, the plaintiff prisoner, a resident of the Baldwin unit, sued Warden Artis, Deputy Warden Davis, and Deputy Warden King (not a party in the present lawsuit), alleging that these individuals violated his Eighth Amendment rights by failing to respond adequately to the risks presented by COVID-19 on February 7, 2022, which resulted in him testing positive for COVID-19 on February 14, 2022. *Shepard*, 2023 WL 6394064 at *1. As in the present lawsuit, the plaintiff in *Shepard* alleged that defendants did not quarantine prisoners Burklow and Hunt who had tested positive on February 7, 2022, that the two prisoners were "allowed to intermix and intermingle with plaintiff and other confirmed negative prisoners from 9:30am [sic] to 2:15pm [sic]," and that one week later, on February 14, 2022, the plaintiff spoke to Warden Artis and Deputy Warden King who

---

[2] The Court notes that *Shepard* (No. 1:22-cv-326) was filed on the same day as *Morris* (No. 1:22-cv-325).

"verified that they authorized said confirmed positive prisoners not being quarantined on February 7, 2022." *See id*.; *Shepard*, No. 1:22-cv-326 (Compl.) (ECF No. 1).

In *Shepard*, the Court set out the legal standard applicable to an Eighth Amendment claim arising from an alleged failure of prison staff to adequately respond to COVID-19:

> In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35-37. To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." *Id*. at 837. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id*. at 844.
>
> In the context of COVID-19, the Sixth Circuit has held that "the objective prong is easily satisfied." *Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020). Ordinary Eighth Amendment principles apply to the subjective prong: "[t]he key inquiry is whether [the defendant] 'responded reasonably to th[is] risk.' " *Id*. (quoting *Farmer*, 511 U.S. at 844). A response may be reasonable even if "the harm imposed by COVID-19 on inmates . . . 'ultimately [is] not averted.' " *Id*. at 841 (quoting *Farmer*, 511 U.S. at 844).

*Shepard*, 2023 WL 6394064 at *4.

### 2.     Defendants had no personal involvement

Defendants contend that Morris failed to state a claim against them under § 1983 because they had no personal involvement in the alleged unconstitutional conduct. "Personal involvement is necessary to establish section 1983 liability." *Murphy v. Grenier*, 406 Fed. Appx. 972, 974 (6th Cir. 2011). "It is axiomatic that the liability of persons sued in their individual capacities under section 1983 must be gauged in terms of their own actions." *Rogan v. Menino*,

175 F.3d 75, 77 (1st Cir. 1999).  A defendant cannot be held liable under § 1983 absent a showing that they personally participated in, or otherwise authorized, approved, or knowingly acquiesced in, the allegedly unconstitutional conduct.  *See*, *e.g.*, *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989); *Hays v. Jefferson*, 668 F.2d 869, 874 (6th Cir. 1982).

> **a.    Deputy Warden Smith was not at LRF during the alleged incidents**

As an initial matter, there is no basis for Morris' claims against defendant Deputy Warden Smith.  Morris does not allege that he spoke to Smith on either February 7th or February 14th.  Morris has presented no evidence to link Smith to the events of which occurred on either date.  Defendants point out that Smith was not even at LRF on those dates, because she was on an approved medical leave.  *See* Declaration of Human Resources Officer Schaub (ECF No. 22-8). Accordingly, defendants' motion for summary judgment should be granted as to defendant Smith.

> **b.    Assistant Deputy Warden Davis**

Similarly, there is no basis for Morris' claims against defendant Deputy Warden Davis.  Morris does not allege that he spoke with Davis on either February 7th or February 14th. Morris has presented no evidence to link Davis to the events which occurred on either date. In this regard, in *Shepard*, the Court pointed out that Davis was not present in Baldwin unit on February 14th, having left work early before the COVID-19 test results were ready.  *Shepard*, 2023 WL 6394064 at *3.  Furthermore, as discussed, *infra*, none of the defendants were involved in identifying prisoners with COVID-19 or deciding whether to quarantine prisoners.  Accordingly, defendants' motion for summary judgment should be granted as to defendant Davis.

> **c.    Warden Artis and the February 14, 2022 critical incident**

Like the plaintiff in *Shepard*, Morris alleged that on February 7th, after the two prisoners tested positive, unidentified officers told him that they had orders from "defendants"  not

10

to quarantine these prisoners because there were the only two infected prisoners, and the risk was low. *See* Compl. at PageID.4; *Shepard*, 2023 WL 6394064 at *3. Like the plaintiff in *Shepard*, Morris also alleged that he spoke to Warden Artis on February 14th about not quarantining the two prisoners, and that Artis verified that she authorized the prisoners not to be quarantined on February 7th. *See* Compl. at PageID.5; *Shepard*, 2023 WL 6394064 at *3.

In her declaration, Warden Artis stated that she served as the acting warden of LRF from May 2021 through April 2022. Artis Decl. (ECF No. 22-3, PageID.225). Artis stated that

> As the acting warden of LRF, I was not responsible for identifying or quarantining prisoners that tested positive for COVID-19. That is the responsibility of healthcare.

*Id*. Artis also stated that she "did not order the corrections officers in the Baldwin housing unit to not quarantine COVID-19 positive prisoners on February 7, 2022, or on any other day." *Id*. at PageID.226. Artis further stated that,

> None of my administrative staff, including Deputy Warden Smith and Assistant Deputy Warden Davis, ordered the corrections officers in the Baldwin housing unit to not quarantine COVID-19 positive prisoners on February 7, 2022, or on any other day. Again, this is a function of healthcare.

*Id*.

Then, Warden Artis recounted the events of February 14, 2022, when she allegedly spoke to Morris and verified that she ordered the officers not to quarantine the two prisoners back on February 7, 2022:

> 9. On February 14, 2022, I was in the Baldwin housing unit. The prisoners in that unit were non-compliant and erratic after receiving results of mass COVID-19 testing.
>
> 10. My purpose for being in the unit was to maintain order, safety, and security. Despite numerous orders, the prisoners would not calm down or return to their cells.

> 11. In order to maintain order, safety, and security and to prevent a riot, I authorized a platoon of officers to come into the housing unit with orders to secure the unit and lock the prisoners in their assigned cells.
>
> 12. This effort is fully documented in Critical Incident Report LRF-011-22. (Exhibit H to Defendants' Brief in Support of Motion for Summary Judgment.)
>
> 13. After this event, I received an apology letter signed by 170 prisoners that were housed in the Baldwin housing unit. The prisoners apologized for their conduct and admitted they acted out in fear of how the COVID-19 pandemic would be handled. Mr. Morris signed this apology letter in the #58 spot. (Attachment 1.)

*Id*. at PageID.226-227.

Morris' claim is based on the allegations in his verified complaint that on February 14, 2022 he "spoke to defendant Artis" and "inquired about the orders not to quarantine confirmed positive prisoners on February 7, 2022", and at that time "Defendant Artis verifed [sic] that she ordered the actions of ofc's on February 7, 2022." Compl. at PageID.5. Morris cannot substantiate this claim.

At his deposition, Morris initially stated that he did not remember talking to Warden Artis, and later stated that he spoke to corrections officers rather than the warden. In clarifying Morris' allegations, when defendants' counsel asked, "[w]here in the unit was [Warden Artis] when you spoke to her", Morris did not answer the question, stating

> They -- they show up on base. A lot of times they wouldn't do a round, but they would try to answer questions and stuff like that. But it basically seemed like they had no COVID protocol in place.

Morris Dep. (ECF No. 22-2, PageID.210).

When asked to explain his conversation with Warden Artis, Morris contradicted the allegations in his verified complaint, stating that he did not remember talking to the warden:

> Q    Can you explain how that conversation went?
>
> A    I can't remember word for word. I will have to -- let me refer back to my paperwork.

12

> Q       Yeah, of course.
>
> A       I don't have the best memory. I spoke to a lot of people. I spoke to some of the CO's, and they was telling me -- because I was asking them why them guys was walking around. I was so sick, I don't remember talking to the warden. I talked to a lot of people, though, when it happened. Anybody that looked like they could help.

*Id*. at PageID.210-211.

Later in his deposition, Morris admitted that he did not talk to the warden on February 14th, but spoke with the corrections officers (CO's):

> Q       I guess what I'm asking is, how did each of the Defendants cause you to get COVID?
>
> A       Oh, how did they do it? Because they was -- they were in control. They were the bosses. They was the one supposed to tell the CO's the COVID protocol. Just like I'm in a position where I got to listen to them, the CO's. The CO's got to listen to warden and the deputy warden and all of them. They the one -- the stuff rolls down the hill. So if they would have did their part, telling them what they was supposed to do, COVID protocol, the officers would have did it right.
>
> Q       Okay.
>
> A       <u>I'll tell you, that's what I was talking to the CO's about it. But the guy who helped me with my grievance, he must have misunderstood me when he said -- he must have thought I said I talked directly to the warden about it. I seen her in the unit, and I tried to talk, but they was too busy because everybody was approaching.</u> Everybody has questions when they seen her.
>
> <u>So I talked to the CO's</u>, and they was like, "We only doing what we told." Because I was asking them, "Why these guys not locked down?" They said, "They told us not to." And then when the second shift officers came in, the second shift came in, they gave the order to lock those guys down. So everybody not doing -- enforcing the COVID protocol they way they was supposed to. That's why they was the ones directly involved with injuring me.

*Id*. at PageID.216-217 (emphasis added).

At his deposition, Morris contradicted the statement in his verified complaint that on February 14, 2022 he spoke to Warden Artis about the incidents which occurred on February

13

7, 2022. Morris has presented no admissible evidence that Warden Artis ordered LRF staff not to quarantine the two prisoners on February 7th or that the warden told Morris on February 14th that she authorized that action. At most, Morris bases his claim against Warden Artis on hearsay statements from unidentified corrections officers. "Hearsay evidence may not be considered on summary judgment." *Jacklyn v. Schering-Plough Healthcare Products Sales Corporation*, 176 F.3d 921, 927 (6th Cir. 1999). *See Livingston Christian Schools v. Genoa Charter Township*, 858 F.3d 996, 1008 (6th Cir. 2017) (statements in an affidavit that amount to hearsay cannot be considered at the summary judgment stage) (citing *Alpert v. United States*, 481 F.3d 404, 408-09 (6th Cir. 2007).

### d. Conclusion

In summary, Morris presented no evidence in his verified complaint or in his deposition testimony that defendants had personal involvement in the decision not to quarantine the two infected prisoners on February 7th, or that on February 14th defendants admitted to Morris that they ordered the CO's not to quarantine the infected prisoners back on February 7th. Furthermore, as explained by Warden Artis, none of the defendants were involved in identifying prisoners with COVID-19 or deciding whether to quarantine prisoners. *See* Artis Decl. at PageID.225-226. To the extent Morris asserts that defendants were personally involved in the alleged constitutional violation because they managed the day-to-day operations of the facility, his claim fails because Morris may not maintain a § 1983 claim based on a respondeat superior theory. "Section 1983 liability must be premised on more than mere respondeat superior, the right to control one's employees." *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). Accordingly, defendants motion for summary judgment should be granted on this basis.

### 3. Qualified Immunity

In the alternative, defendants are entitled to qualified immunity. Under the affirmative defense of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. . . Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015) (internal quotation marks omitted). Thus, the doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Carroll v. Carman*, 574 U.S. 13, 17 (2014).

"When a defendant raises a defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity." *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007). The Sixth Circuit applies a two-tiered inquiry in reviewing the dismissal of a claim on qualified immunity. *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

> The first step is to determine if the facts alleged make out a violation of a constitutional right. The second is to ask if the right at issue was clearly established when the event occurred such that a reasonable officer would have known that his conduct violated it.

*Id*. (internal quotation marks omitted).

Here, Morris claims that on one occasion, Warden Artis, Deputy Warden Smith, and Assistant Deputy Warden Davis were responsible for not properly quarantining prisoners that tested positive for COVID-19 and that those prisoners were not separated from the prisoner

15

population for about five hours after testing positive. *See* Compl. at PageID.4-5. Defendants contend that Morris cannot point to any court that held prior to February 7, 2022, that prison officials violated the Eighth Amendment by not immediately quarantining prisoners because "[t]he issues and challenges posed by COVID-19 are unlike any other in the modern era," and "COVID-19 is, by definition, a 'novel' coronavirus." *Tate v. Arkansas Department of Corrections*, No. 4:20-CV-558-BSM-BD, 2020 WL 7378805 at *11 (Nov. 9, 2020), *R&R adopted*, 2020 WL 7367864 (E.D. Ark. Dec. 15, 2020). *See* Defendants' Brief (ECF No. 22, PageID.176-177) (citing *Tate*).

Warden Artis stated that as acting warden of LRF, she was familiar with the MDOC Policies, protocols, and Directors Office Memoranda (DOMs) related to COVID-19, and that the facility implemented various measures to minimize the spread of COVID-19 including complying with those policies, protocols, and DOMs. *See* Artis Decl. at PageID.225-226. *See also*, *Shepard*, 2023 WL 6394064 at *4.

During the relevant time period (February 7, 2022 through February 14, 2022), the Director issued two different DOMs related to COVID-19: DOM 2022-21R4 (eff. January 24, 2022) (ECF No. 22-5); and, DOM 2022-21R5 (eff. February 9, 2022, superseding DOM 2022-21R4) (ECF No. 22-6). Both DOMs advised MDOC personnel that "This DOM outlines the precautions staff shall take to help prevent COVID-19 from spreading." *See* DOMs (PageID.245, 269). In *Shepard*, the Court summarized some of the precautions set out in these DOMs:

> Both DOMs specified, among other things: (1) that staff and prisoners were to wear approved masks or facial coverings at all times while indoors at MDOC facilities; (2) that Personal Protective Equipment (PPE) included N95 or other acceptable masks, gowns, eye protection, and powder-free nitrile gloves; (3) that social distancing recommendations were to be followed at all times, including in programing and classrooms, the chow line, staff screening, etc., and group meetings were to be limited to ten individuals and technology used in place of in-person interactions whenever possible; (4) close contacts and procedures for handling

16

> close contacts among staff and prisoners; (5) designation of isolation areas to quarantine COVID-19-positive prisoners, as soon as resources permitted, as well as isolation areas for those deemed close contacts and those under investigation for being a close contact; (6) that transfers and cell moves were prohibited in most circumstances, only when necessary, and with staff effecting such moves wearing required PPE; (7) testing of close contacts, regardless of vaccination status; and (8) screening of all individuals entering any MDOC facility.

*Shepard*, 2023 WL 6394064 at *4.

In *Shepard*, this Court held that defendants Warden Artis and Deputy Warden Davis (two of the defendants in this lawsuit) were entitled to qualified immunity with respect to the prisoner's claim that he caught COVID-19 due to the failure to quarantine the two prisoners on February 7, 2022. As discussed, *supra*, this is the same claim raised by Morris in the present lawsuit.

In *Shepard*, the Court determined that the plaintiff did not meet the "second prong" of the qualified immunity analysis because there was no clearly established law at that time as to whether the failure to immediately quarantine prisoners who tested positive for COVID-19 violated the other prisoners' Eighth Amendment rights :

> [Plaintiff's] claim also fails on the second prong because he cannot show that Defendants violated clearly established law. The second prong focuses on the state of the law at the time the alleged violation occurred. As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). It is not enough to show that the right is established at " 'a high level of generality.' " *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017) (quoting *Ashcroft*, 563 U.S. at 742). "[A] plaintiff must identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *Id*. at 993 (quoting *White*, 137 S. Ct. at 552). Stated differently, "[o]n both the facts and the law, specificity is [a court's] guiding light." *Novak v. City of Parma*, 932 F.3d 421, 426 (6th Cir. 2019). "An official's conduct flunks this 'clearly established' test only if the conduct's unconstitutionality was 'beyond debate' when the official acted, such that any reasonable person would have known that it exceeded constitutional bounds." *DeCrane v. Eckart*, 12 F.4th 586, 599 (6th Cir. 2021). To determine whether a right

17

> is clearly established, a district court within the Sixth Circuit may consider binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point. *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010) (quoting *Risbridger v. Connelly*, 275 F.3 565, 569 (6th Cir. 2002)). Given the unique and "unprecedented" challenges that that the COVID-19 coronavirus posed to prison officials in the safe management of prison facilities, *see Ryan v. Nagy*, No. 2:20-cv-11528, 2021 WL 6750962 at *9 (E.D. Mich. Oct. 25, 2021), *report and recommendation adopted in part*, 2022 WL 260812 (E.D. Mich. Jan. 26, 2022), clarity on the law is particularly important.
>
> Plaintiff fails to demonstrate that the law was so clear that a reasonable official in Defendants' position would have known that failure to immediately quarantine prisoners who tested positive for COVID-19 violates the Eighth Amendment, particularly given that other reasonable preventative measures had been implemented to stop or slow the spread of the disease.

*Shepard*, 2023 WL 6394064 at *6.

The Court's conclusion in *Shepard* is equally applicable to Morris, whose lawsuit involves the same incident and two of the same defendants. In other words, *Shepard* established that a reasonable prison official at LRF would not have known on February 7, 2022, that a failure to immediately quarantine prisoners who tested positive for COVID-19 violated the other prisoners' Eighth Amendment rights. Accordingly, defendants Artis, Davis and Smith are entitled to qualified immunity and should be granted summary judgment on that basis.

### 4. Causation

Finally, defendants contend that Morris' § 1983 claim fails because he cannot prove by a preponderance of the evidence that defendants' deliberate indifference caused his alleged harm, *i.e.*, that Morris became infected with COVID-19 due to defendants' actions because two prisoners not quarantined until five hours after having tested positive for COVID-19. After pointing out that COVID-19 was a world-wide pandemic in February 2022, defendants ask the Court to speculate about how and when Jones became infected with COVID-19, and then ask the Court to conclude that "Morris cannot show by a preponderance of the evidence that but-for

18

Warden Artis, DW Smith, and ADW Davis's alleged conduct, he would not have contracted COVID-19." *See* Defendants' Brief at PageID.179. Defendants' conclusory argument, which asks the Court to speculate and to weigh the evidence, is without merit and does not provide a basis for granting summary judgment.

### III. Recommendation

For the reasons set forth above, I respectfully recommend that defendants' motion for summary judgment (ECF No. 21) be **GRANTED**, that plaintiff Morris' motion for leave to file an amended complaint (ECF No. 30) be **DENIED**, and that this action be **terminated**.

Dated: February 16, 2024

/s/ Ray Kent
Ray Kent
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).